IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

| | | |
|---|---|---|
| WEST LUMBERTON BAPTIST CHURCH, CURRIE CHAIN SAW, INC., C.J.M. VENTURES, INC., WILLIAM LOCKLEAR, D/B/A STRICKLAND'S BARBERSHOP, TBL ENVIRONMENTAL LABORATORY, INC., SAMMY'S AUTO SALES, INC., LINDA SAMPSON, and ERIC CHAVIS, individually and on behalf of all others similarly situated, | ) ) ) ) ) ) ) ) ) ) | Case No. 7:18-cv-00178 |
| Plaintiffs, | ) ) | **CLASS ACTION COMPLAINT** |
| v. | ) ) | **(JURY TRIAL DEMAND)** |
| CSX CORPORATION, CSX TRANSPORTATION, INC., and CSX INTERMODAL TERMINALS, INC., | ) ) ) ) | |
| Defendants. | ) | |

Plaintiffs West Lumberton Baptist Church, Currie Chain Saw, Inc., C.J.M. Ventures, Inc., William Locklear d/b/a Strickland's Barbershop, TBL Environmental Laboratory, Inc., Sammy's Auto Sales, Inc., Linda Sampson, and Eric Chavis individually and on behalf of themselves and all other persons and entities similarly situated, allege:

**INTRODUCTORY STATEMENT**

1.      Since 2003, Defendants CSX Corporation, CSX Transportation, Inc., and CSX Intermodal Terminals, Inc. have been on notice that an underpass at Interstate 95 owned by Defendants ("the I-95 underpass") and running through the levee system of the City of Lumberton ("the City") creates a substantial risk of destructive flooding to the southern and western portions of the City. Nonetheless, Defendants have taken no steps to correct the problem.

2. As a direct result of Defendants' disregard of the risk, flooding of the southern and western parts of the City occurred when the Lumber River rushed through the ungated underpass during 2016's Hurricane Matthew. The damage was extensive.

3. Although Defendants could not have had a more compelling demonstration of the damage that its underpass could cause, they still failed and refused to work with the City and other governmental bodies to take steps – such as building a long-recommended floodgate – to ensure that the flooding resulting from Hurricane Matthew was not repeated.

4. Just two years later, Hurricane Florence threatened the City. Governmental officials – recognizing that the City was potentially facing a repetition of Matthew's devastating loss – pleaded with Defendants to allow the City to build a temporary sandbag berm to try to fill the hole created by the I-95 underpass. Defendants repeatedly refused, threatening legal action if the City acted without permission. Only when the Governor signed an emergency order could volunteers, government workers, and the National Guard attempt to construct the berm just as Hurricane Florence struck. When the berm ultimately failed, after protecting the City for two days, the Lumber River again rushed through the I-95 underpass, precisely as it had two years earlier. Once again, flooding forced evacuations, has left people homeless, closed businesses, and destroyed personal property and inventory.

5. This is a class action on behalf of residents and businesses in the southern and western portions of the City who have twice suffered catastrophic damage because of Defendants' failure to take basic action. Defendants have twice ignored foreseeable risks, and rejected cooperating with local governments and building a floodgate. Their willful, wanton, or reckless disregard was compounded in 2018, when Defendants prevented the City from having the necessary time to build a more formidable temporary berm.

## PARTIES

6. Plaintiff West Lumberton Baptist Church is a non-profit corporation organized under the laws of the State of North Carolina. It is located at 2320 W. 5th Street, Lumberton, NC 28348. During Hurricane Matthew, flooding caused the Church to suffer $1.3 million in damage, which included destruction of the sanctuary, parsonage, and education buildings. Other buildings that were part of the Church had all of their interior furnishings destroyed and required substantial repair. The Church also had to rebuild two parking lots due to the flooding. During Hurricane Florence, the church and classrooms and fellowship buildings all sustained extensive damage from flooding, while one of the parking lots was again destroyed. Estimated damages from Hurricane Florence is $800,000 to $1 million.

7. Plaintiff Currie Chain Saw, Inc. is a corporation organized under the laws of the State of North Carolina and is located at 1311 W. 5th Street, Lumberton, NC 28358. The business is a Honda dealership and during Hurricane Matthew lost $2 million in inventory. In addition, the flooding from Hurricane Matthew caused substantial damage to the exterior of three buildings, while, inside, one building had 33 inches of floodwater, another had 30 inches of floodwater, and a third had 18 inches of floodwater. One of the buildings required a complete tear out of all drywall and paneling. During Hurricane Florence, floodwaters again invaded the businesses' buildings requiring substantial cleanup.

8. Plaintiff C.J.M. Ventures, Inc. is a corporation organized under the laws of the State of North Carolina and owns property located at 1001 W. 5th Street, Lumberton, NC 28358. Floodwaters during Hurricane Matthew left three to four feet of water in the building and destroyed the business' inventory, including ATVs, UTVs and motorcycles. The building itself had to be gutted. During Hurricane Florence, floodwaters covered the land, although the water did not, this

time, enter the building.

9. Plaintiff William Locklear d/b/a Strickland's Barbershop is located at 2209 W. 5th Street, Lumberton, NC 28358. As a result of flooding during Hurricane Matthew, the Barbershop sustained damage to its building and equipment, resulting in closure of the business for approximately seven months. With Hurricane Florence, floodwaters damaged cabinets and equipment.

10. Plaintiff TBL Environmental Laboratory, Inc. is a corporation organized under the laws of the State of North Carolina and is located at 2401 W. 5th Street, Lumberton, NC 28358. Due to damage from floodwaters during Hurricane Matthew, TBL was forced to close for more than three months. The land was flooded with two feet of water while 16 inches was inside the business, extensively damaging flooring, sheetrock, equipment, records, and supplies and requiring mold remediation. Floodwaters from Hurricane Florence again covered the property and entered TBL's building causing closure of the business for an undetermined amount of time due to damage to the interior of the building, including damage again to the flooring, sheetrock, and records, and the need for additional mold remediation.

11. Plaintiff Sammy's Auto Sales, Inc. is a corporation organized under the laws of the State of North Carolina and is located at 1509 W. 5th Street, Lumberton, NC 28358. During the flooding from Hurricane Matthew, the building owned by Sammy's Auto Sales had five and a half feet of water in the office, and shops that the company leased out were also under water. The company suffered extensive damage to the building, equipment, and cars. The business was closed for five weeks and also lost rent. The flooding from Hurricane Florence resulted in flooding to a level of one to two feet and substantial damage to the interior of the buildings. Shops leasing from Sammy's Auto Sales lost inventory and business.

12. Plaintiff Linda Sampson owns her home located at 2912 Anne Street, Lumberton, NC 28358. During both Hurricanes Matthew and Florence, floodwaters covered her property and ran under her home.

13. Plaintiff Eric Chavis owns a home at 2960 Bragg Street, Lumberton, NC 28358. As a result of flooding over his property during Hurricane Matthew, he sustained substantial damage to insulation, ductwork, the air conditioning unit, and a water heater. During Hurricane Florence, his property again flooded, and he sustained damage to the air conditioning unit, insulation, ductwork, a generator, and a truck.

14. Defendant CSX Corporation is a corporation organized and existing under the laws of the State of Virginia with a principal place of business at 500 Water Street, Jacksonville, Florida 32202. Upon information and belief, CSX Corporation maintains minimum contacts with the State of North Carolina sufficient to satisfy the due process clause of the United States Constitution.

15. Defendant CSX Transportation, Inc. is a corporation organized and existing under the laws of the State of Virginia with a principal place of business at 500 Water Street, Jacksonville, Florida 32202. CSX Transportation, Inc. is licensed to do business in North Carolina and maintains minimum contacts with the State of North Carolina sufficient to satisfy the due process clause of the United States Constitution.

16. Defendant CSX Intermodal Terminals, Inc. is a corporation organized and existing under the laws of the State of Virginia with a principal place of business at 550 Water Street, Jacksonville, Florida 32202. CSX Intermodal Terminals, Inc. is licensed to do business in North Carolina and maintains minimum contacts with the State of North Carolina sufficient to satisfy the due process clause of the United States Constitution.

## **JURISDICTION AND VENUE**

17. This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs, and because Plaintiffs are citizens of North Carolina and all Defendants are citizens of another State.

18. Venue of this class action in this district is proper under 28 U.S.C. § 1391 because Defendants do business in the Eastern District of North Carolina, Plaintiffs and the putative class members ("the Classes") reside and do business in the Eastern District of North Carolina, and the events or omissions giving rise to the claims asserted below occurred in the Eastern District of North Carolina.

## FACTUAL ALLEGATIONS

19. The Lumber River runs through Lumberton, North Carolina. In 1977, levees were constructed to protect the City from flooding by the Lumber River. However, there remained a gap in the City's levee system where Defendants' railroad tracks ran under Interstate 95. As a May 2018 study reported, to protect the City during a flooding event, the levee system depended on the gap created by the railroad underpass being filled with emergency sandbagging.

20. Although FEMA accredited this levee system as providing flood protection on the 1993 Flood Protection Maps, the North Carolina Flood Map Program ("NCFMP") questioned that accreditation decision in May 2003 in part because of the I-95 underpass gap in the levee system. Ultimately, discussions between NCFMP and FEMA led to the conclusion that the levee system did not provide flood protection because a previously planned closure for the underpass was not implemented and sandbagging the opening did not comply with federal regulations. Despite these conclusions showing that the operation and ongoing maintenance of the I-95 underpass as then configured created a risk of flooding for properties beyond the underpass, Defendants did not

exercise due care to make adequate provision for floodwaters that would be funneled through the underpass it owned by implementing a closure or floodgate system for the underpass. Consequently, Defendants left the City vulnerable to flooding despite the levee system.

21. In October 2016, Hurricane Matthew, a Category 1 hurricane, struck Lumberton. Although the City's levees were not breached during Matthew, flood waters from the Lumber River rushed through the hole in that levee system created by Defendants' I-95 underpass and flooded the southern and western parts of the City. Much of the flooded part of the City was navigable only by boat, and the flood waters inundated the City's water plant. The catastrophic flooding in Lumberton resulted in more than 1,500 people being displaced for months, 2,367 structures being damaged, and $257,574,000 in damages.

22. Despite the devastation of Hurricane Matthew, which demonstrated that Defendants were not complying with their duty to operate and maintain their underpass with skill, caution, and due care for City residents and businesses downflow from flooding likely to occur through their underpass, Defendants took no steps to devise protective measures that would ensure that their railroad underpass would not cause flooding during similar weather events.

23. Following Hurricane Matthew, the Resilient Redevelopment Plan for Robeson County concluded that the majority of the homes flooded in the southern and western areas of Lumberton were due to water rushing through Defendants' I-95 underpass. The report concluded that without a floodgate at the I-95 underpass, the community was at risk of suffering similar flooding events in the future. North Carolina Emergency Management and the Golden LEAF Foundation offered to provide all the funding needed to construct a $3.5 million floodgate to seal the hole in the levee system created by Defendants' railroad underpass.

24. Because of the 2003 conclusions, the catastrophic damage from Hurricane Matthew, and the Resilient Redevelopment Plan for Robeson County, Defendants knew of the risk of further devastating flooding that arose from their maintenance of their railroad underpass without a floodgate or other protective measures. Defendants did not, however, comply with their duty to exercise due care in the operation and maintenance of their underpass by taking any action to construct a floodgate or developing any other plan to prevent the Lumber River from overflowing through the gap in the levee system created by Defendants' I-95 underpass and again flooding the southern and western portions of the City.

25. North Carolina Department of Transportation and North Carolina Emergency Management prepared a May 1, 2018 Lumber River Basin Flood Analysis and Mitigation Strategies Study. After describing the history of the construction of the levee system and the issues raised regarding the lack of any closure of the gap at the I-95 underpass, the study noted that plans were underway "for the installation of a floodgate at the underpass in order to seal the breach in the levee during an event." The study then emphasized that "[d]uring Hurricane Matthew, the SCS sandbagging requirement was not met, thereby causing drastic flooding of the interior of the levee." The study concluded that a floodgate would save 2,000 buildings and $232.6 million in damage for a Matthew-equivalent flood, which would amount to a greater than 80% reduction in damage.

26. Even though Defendants were fully aware of the danger posed by its I-95 underpass, according to reports by local governmental officials to the media, Defendants had not participated in discussions after Hurricane Matthew about how to mitigate future flooding disasters.

27. One government official reported that CSX slowed the process of construction of the floodgate despite the willingness of North Carolina Emergency Management and the Golden LEAF Foundation to fully fund the estimated cost of the floodgate.

28. In fact, although Defendants had promised to attend a meeting in Raleigh that took place a month before the City was flooded by Hurricane Florence, no representative ultimately attended.

29. Defendants' only explanation for their nonparticipation in discussions to address how to resolve the flooding risk posed by their I-95 underpass has been that the governmental plans have not been clear enough – an explanation revealing that Defendants were abdicating responsibility for resolving the serious flooding problem posed by Defendants' I-95 underpass and were not themselves working to address the issue. A CSX spokesperson indicated to the press only that a company vice president had been planning prior to Hurricane Florence to begin conversations with Lumberton officials in October – a date at a point when the hurricane season is nearly over.

30. In September 2018, Hurricane Florence began approaching North Carolina. Early in the week of September 10, 2018, City leaders began planning to protect the City from experiencing flooding of the type that occurred with Hurricane Matthew. No one from Defendants participated in any of the planning efforts. Because no floodgate had yet been installed at Defendants' I-95 underpass, government officials requested permission to construct a temporary sandbag berm across the railroad tracks at the I-95 underpass to fill the critical gap in the City's levee system.

31. City officials reported to the media that CSX not only refused to give permission for the City to build the temporary berm, but that CSX on multiple occasions threatened to sue or

initiate prosecutions for trespass if anyone tried to place sandbags on the tracks at the I-95 underpass.

33. On Thursday, September 13, 2018, as Hurricane Florence neared Wilmington and forecasts predicted that the southeastern part of North Carolina would face two feet of rain, City leaders grew desperate. They contacted North Carolina Governor Roy Cooper and the North Carolina Department of Public Safety to ask the Governor to give them permission to build a temporary berm to plug the levee system at the I-95 underpass.

33. The Governor issued an order authorizing the temporary berm on Friday, September 14, 2018. A spokesperson for the Governor reported to the press that "CSX officials who were contacted did not consent to allowing for sandbagging of the tracks, arguing that there was no proof that it would work and that it would cause significant damage to their tracks. Upon further consultation and advice of local and state emergency management, the Governor issued an emergency order on Friday morning to allow for the construction of a temporary berm at the CSX railroad intersection."

34. Defendants refused to cooperate in efforts to protect the City from flooding until the Governor issued his emergency order. As a City Councilman John Cantey, Jr. stated bluntly, "We were really stuck in a barrel. The water's coming. We can't stop it."

35. Following issuance of the Governor's order, volunteers, government workers, and the National Guard gathered in a church parking lot and as Hurricane Florence struck Lumberton, filled 5,000 sandbags in tropical force winds while being pelted with rain. The sandbags were then used to build the temporary berm authorized by the Governor. The berm held until 2:00 p.m. Sunday, September 17, 2018.

36. When the improvised sandbag levee gave way, the Lumber River poured through the I-95 underpass and flooded western and southern Lumberton, exactly as it had two years earlier during Hurricane Matthew. Ultimately, the Lumber River crested a foot higher than it had during Hurricane Matthew.

37. Subsequent to the flooding, Defendants' spokesperson gave reasons for their refusal to authorize the temporary sandbag berm that upon information and belief were not truthful and that were inconsistent with what the Governor's Office had been told.

38. As occurred during Hurricane Matthew, the southern and western portions of Lumberton experienced devastating flooding because of water from the Lumber River rushing through Defendants' I-95 underpass. Only two years after the catastrophic damage of Hurricane Matthew, numerous homes and vehicles were again damaged or destroyed while businesses and churches equally suffered – all because Defendants failed to take any action to ensure the flooding that followed Hurricane Matthew would not occur again.

39. Defendants, who have been on notice since at least 2003 of the need to remedy the gap in the City's levee system created by their I-95 underpass, could have prevented the catastrophes that occurred during Hurricanes Matthew and Florence by complying with their duty to exercise due care, skill, and caution in operating and maintaining their I-95 underpass by employing proper risk management practices, following industry standards, heeding the advice of experts, and responding to local government requests in 2018 for permission to construct a temporary berm. However, Defendants chose not to provide or allow for precautionary measures, but rather to save money at the expense of the citizens and businesses of Lumberton. Their self-serving measures were taken with willful, wanton, and reckless indifference to the safety, economic interests, and property of Plaintiffs and the Classes. Because the community affected

by the flooding due to Defendants is especially economically vulnerable, Defendants' wholesale disregard of the risks to this community arising from their unwillingness to remedy the flooding hazard created by their I-95 underpass is particularly appalling.

## **CLASS ACTION ALLEGATIONS**

40. Plaintiffs request class action certification pursuant to Fed. R. Civ. P. 23(b)(2) or (b)(3) on behalf of proposed classes defined as:

> Area Residents Class:
>
> All persons and entities who own real and personal property in the West 5th Street area of Lumberton, North Carolina impacted by the lack of a flood gate on Defendants' property at the intersection of VFW Road and I-95 in Lumberton, North Carolina and whose homes, vehicles, or other real or personal property suffered damage due to flooding through Defendants' I-95 railway underpass after Hurricanes Matthew and/or Florence.
>
> Area Business Class:
>
> All businesses located in the West 5th Street area of Lumberton, North Carolina impacted by the lack of a flood gate on Defendants' property at the intersection of VFW Road and I-95 in Lumberton, North Carolina, that lost income or suffered property damage due to flooding through Defendants' I-95 railway underpass after Hurricanes Matthew and/or Florence.

The Fed. R. Civ. P. 23(b)(2) class and Fed. R. Civ. P. 23(b)(3) class are collectively the "Classes" and their members are referred to as "Class members."

41. The number of Class members is sufficiently numerous to make class action status the most practical method for Plaintiffs to secure redress for injuries sustained and to obtain class-wide equitable injunctive relief.

42. There are questions of law and fact raised by the named Plaintiffs' claims common to those raised by the Classes they seek to represent. Such common questions predominate over questions affecting only individual members of the Classes.

43. The violations of law and resulting harm alleged by the named Plaintiffs are typical of the legal violations and harm suffered by all Class members.

44. As class representatives, Plaintiffs will fairly and adequately protect the interests of the Class members. Plaintiffs' counsel are unaware of any conflicts of interest between the Class representatives and absent Class members with respect to the matters at issue in this litigation; the Class representatives will vigorously prosecute the suit on behalf of the Classes; and the Class representatives are represented by experienced counsel. Plaintiffs are represented by attorneys with substantial experience and expertise in complex and class action litigation involving personal and property damage.

45. Plaintiffs' attorneys have identified and thoroughly investigated all claims in this action, and have committed sufficient resources to represent the Classes.

46. The maintenance of the action as a class action will be superior to other available methods of adjudication and will promote the convenient administration of justice. Moreover, the prosecution of separate actions by individual members of the Classes could result in inconsistent or varying adjudications with respect to individual members of the Classes.

47. Defendants have acted or failed to act on grounds generally applicable to Class members, necessitating declaratory and injunctive relief for the Classes.

48. In the alternative, Plaintiffs seek class certification as to particular issues as permitted under Fed. R. Civ. P. 23(c)(4). Plaintiffs seek certification as to the common questions regarding (a) Defendants' knowledge of the risk of flooding created by their I-95 underpass, (b) whether Defendants had a duty to take action to eliminate and/or reduce the risk of flooding, (c) whether Defendants negligently failed to take action to eliminate the risk of flooding created by the I-95 underpass, (d) whether Defendants obstructed efforts to protect the Classes from flooding

from Hurricane Florence, and (e) Defendants' liability for damages occurring from flooding due to Hurricane Matthew and Hurricane Florence. Plaintiffs respectfully maintain that class certification as to these issues is appropriate because certification as to particular issues is superior to any alternative means of adjudication as it eliminates the possibility of duplicative, inefficient litigation of identical issues. Resolution of these matters would materially advance the litigation.

## FIRST CLAIM FOR RELIEF

## NEGLIGENCE

49. Plaintiffs repeat and reallege the allegations set forth in the preceding paragraphs as if fully restated here.

50. At all times material, Defendants were responsible for the operation and maintenance of the railway underpass at I-95 in Lumberton, North Carolina.

51. At all times material, Defendants owed and breached duties of ordinary and reasonable care to Plaintiffs and the Classes in connection with the operation and maintenance of the railway underpass, and additionally owed and breached duties to Plaintiffs and the Classes to guard against and/or prevent the risk of flooding through Defendants' I-95 railway underpass.

52. Plaintiffs, as owners, lessors, lessees, and/or operators of real property or businesses in the southern and western sections of Lumberton, North Carolina were within an appreciable zone of risk from Defendants' I-95 underpass and, as such, Defendants were obligated to protect them.

53. Upon learning of the increased risk of flooding created by their I-95 underpass, Defendants, as the owner and party in control of the I-95 underpass, owed Plaintiffs and the Classes a duty to act reasonably to take appropriate measures regarding their underpass to prevent damage

to Plaintiffs' and the Classes' properties and businesses from flooding by the Lumber River overflowing its banks and flowing through the underpass.

54. Defendants breached their duties by failing to construct a floodgate or take other action that would prevent the flow of Lumber River floodwaters through the I-95 underpass and into Plaintiffs' and the Classes' communities.

55. Defendants further breached their duties by failing to build or facilitate the building, and in fact refusing to allow the City to build a temporary berm at the I-95 underpass prior to Hurricane Florence's landfall.

56. In addition, Defendants failed to exercise reasonable care to ensure that adequate safeguards, protocols, procedures and resources would be readily available to prevent and/or mitigate or reduce the effects of flooding rushing through the I-95 railway underpass, and thereby breached duties owed to Plaintiffs and the Classes.

57. Defendants knew or should have known that the acts and omissions described above could result in significant damage to Plaintiffs and the Classes and did in fact result in catastrophic damage following Hurricane Matthew and Hurricane Florence.

58. Defendants willfully, wantonly, or with reckless indifference to the risk of flooding to Plaintiffs and the Classes failed to take appropriate action to protect Plaintiffs and the Classes from the threat of catastrophic damage posed by flooding through Defendants' I-95 underpass.

59. As a direct and proximate result of Defendants' negligence, Plaintiffs and the Classes have suffered a loss of business income, loss of the use and destruction of their homes, inconvenience sustained by the mandatory evacuations, and associated damages.

## SECOND CLAIM FOR RELIEF

## PUBLIC AND PRIVATE NUISANCE

60. Plaintiffs repeat and reallege the allegations set forth in the preceding paragraphs as if fully restated here.

61. Defendants' failure, once they became aware of the risk of flooding created by their I-95 underpass, to construct a floodgate or take other action to ensure that Lumber River flood waters would not breach the City's levee system by flowing through the underpass caused and continues to cause a substantial interference with Plaintiffs' and the Classes' use and enjoyment of their properties and have materially diminished and continue to diminish the value of the properties.

62. Defendants were on notice as of 2003 that flood waters could flow through their I-95 underpass and invade Plaintiffs' and the Classes' interests in the use and enjoyment of their lands and properties. Following Hurricane Matthew, Defendants actually knew that flood waters flowing unimpeded through their I-95 underpass would cause mass evacuations, destruction of homes and businesses, and other catastrophic damages. Defendants' failure to remedy the risk created by their I-95 underpass was willful, wanton, and/or reckless.

63. Defendants' substantial and unreasonable interference with the use and enjoyment of Plaintiffs' and the Classes' properties and continuing failure to remedy a condition that risks further substantial and unreasonable interference with such use and enjoyment constitutes a continuing private and public nuisance.

64. Defendants' willful and wanton failure to act has injured Plaintiffs' and the Classes' properties in a manner that is special to properties in their location, and not shared by, the general public.

65. Defendants' creation and continuing creation of a private and public nuisance proximately caused and threatens to continue to proximately cause substantial injuries to Plaintiffs

and the Classes in the form of property damage and potentially bodily injury for which Defendants are liable. The substantial injury to Plaintiffs and the Classes includes, but is not limited to, the damage to and destruction of homes, businesses, and other property; loss of business; and evacuation from their homes and businesses.

## THIRD CLAIM FOR RELIEF

## TRESPASS

66. Plaintiffs and the Classes repeat and reallege the allegations set forth in the preceding paragraphs as if fully restated here.

67. Defendants' willful and wanton refusal and failure, once they became aware of the risk of flooding created by their I-95 underpass, to construct a floodgate or take other action to ensure that Lumber River floodwaters would not breach the City's levee system by flowing through the underpass caused and continues to risk causing intermittent catastrophic flooding invading Plaintiffs' and the Classes' properties, including homes and businesses.

68. Additionally, Defendants' obstruction of the efforts of the City to build a temporary berm bridging the gap in the City's levee system in advance of Hurricane Florence prevented mitigation of the flooding and led to increased flow of water over and into the Plaintiffs' and Classes' properties and increased damages.

69. Defendants' I-95 underpass' funneling of floodwaters onto Plaintiffs' and the Classes' properties was and continues to be without permission or authority from Plaintiffs or any of the members of the Classes.

70. The flooding of Plaintiffs' and the Classes' properties through Defendants' I-95 underpass constitutes an intermittent trespass diverting floodwaters onto Plaintiffs' and the Classes' properties that will recur in the future.

71. Defendants' trespass upon Plaintiffs' and the Classes' properties has caused catastrophic damage to Plaintiffs and the Classes for which Defendants are liable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request the following relief from the Court:

1. An order certifying this action as a class action and appointing Plaintiffs' counsel to serve as Class Counsel;

2. An injunctive order requiring Defendants to build a floodgate to prevent future flooding and an injunctive order requiring Defendants to remediate the harm caused by Defendants' conduct and inaction including but not limited to repairs of private property;

3. An award of compensatory damages;

4. An award of punitive damages;

5. An award of pre-judgment and post-judgment interest;

6. An award of reasonable attorneys' fees and litigation expenses; and

7. Such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury as to all issues and claims for which a jury trial is available by law.

Dated: October 4, 2018.

Respectfully submitted,

\_\_/s/ Martha Geer_____

Martha Geer
N.C. Bar No. 13972
Jay Chaudhuri
N.C. Bar No. 27747
Adam Langino
**COHEN MILSTEIN SELLERS**
  **& TOLL PLLC**
150 Fayetteville Street, Suite 980
Raleigh, NC 27601
Telephone: (919) 890-0560
Facsimile: (919) 890-0567
mgeer@cohenmilstein.com
jchaudhuri@cohenmilstein.com
alangino@cohenmilstein.com

Theodore J. Leopold
**COHEN MILSTEIN SELLERS**
  **& TOLL PLLC**
2925 PGA Boulevard, Suite 220
Palm Beach Gardens, FL 33410
Telephone: (561) 515-1400
Facsimile: (561) 515-1401
tleopold@cohenmilstein.com

Gary K. Shipman
N.C. Bar No. 9464
**SHIPMAN & WRIGHT, LLP**
575 Military Cutoff Road, Suite 106
Wilmington, NC 28405
Telephone: (910) 762-1990
Facsimile: (910) 762-6758
gshipman@shipmanlaw.com

K. Robert Davis
N.C. Bar No. 22911
**THE BRITT LAW FIRM, P.C.**
107 N. Court Square, Suite 22
Lumberton, NC 28358
Telephone: (910) 671-4500
Facsimile: (866) 780-8245
thebrittlawfirm@yahoo.com

*Counsel for all Plaintiffs*