IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
Case No. 7:18-cv-00178-BO

|  |  |
|---|---|
| WEST LUMBERTON BAPTIST CHURCH, CURRIE CHAIN SAW, INC., C.J.M. VENTURES, INC., WILLIAM LOCKLEAR, D/B/A STRICKLAND'S BARBERSHOP, TBL ENVIRONMENTAL LABORATORY, INC., SAMMY'S AUTO SALES, INC., LINDA SAMPSON, AND ERIC CHAVIS, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> CSX TRANSPORTATION, INC., <br><br> Defendant. | **MEMORANDUM IN SUPPORT OF CSX TRANSPORTATION INC.'S MOTION TO DISMISS COMPLAINT** <br><br> Fed. R. Civ. P. 12(b)(6); LCR 7.2 |

Plaintiffs seek to hold CSX Transportation, Inc. ("CSXT"), a railroad, responsible for property damages they allegedly suffered when heavy rains from Hurricane Florence caused the Lumber River in Lumberton, North Carolina to overflow its banks and flood the surrounding area. All of plaintiffs' claims – for negligence, nuisance and trespass – suffer from the same insurmountable flaw: they presume, without support, that a landowner is required to protect other landowners from floodwaters flowing in their natural course. Plaintiffs assert what amounts to a free-flowing duty to the public – they in fact call it a "duty to prevent" – that would impose upon CSXT, a private landowner, the obligation to make far-reaching policy decisions about flood control not merely for neighbors but for all landowners potentially encountering that act of God. No such duty exists in law. And understandably so, since flood protection embodies broad and

competing policy interests that a state does not want a private landowner to determine. The principle is demonstrated starkly in the unfortunate case of flooding in Lumberton for, at the same time CSXT is being sued by residents for *failing to act* to prevent flood waters from coming under the I-95 overpass, the City of Lumberton is being separately sued by other residents *for acting* by installing sandbags beside the very same overpass. Absent duty, or other legal obligation to act, there is no tort, and plaintiffs' claims fail as matter of law.

Moreover, in asking the Court to instruct CSXT on the "operation and maintenance" of its rail system, plaintiffs run headlong into the preemptive effect of the Interstate Commerce Clause Termination Act of 1995. Courts find as much in settings just like this, on the pleadings.

Plaintiffs' claims fail for the additional reason that they do not and cannot plausibly allege that CSXT proximately caused the widespread flooding that occurred during this natural disaster, since the flooding was caused by a hurricane, not by CSXT.

Finally, plaintiffs' nuisance and trespass claims fail because plaintiffs have not and cannot allege that the flooding was the result of an unlawful, unreasonable, or intentional act by CSXT.

Plaintiffs' claims should be dismissed.

## **BACKGROUND**

This lawsuit seeks to blame CSXT for a hurricane-induced flood. In 2016, Hurricane Matthew hit North Carolina, causing the Lumber River to breach its banks leading to extensive flooding in Lumberton, North Carolina. On September 14, 2018, a second major hurricane, Hurricane Florence, made landfall on the North Carolina coast. As Florence moved inland across eastern North Carolina, heavy rain from the storm inundated the Lumber River, breaching its banks and again leading to expansive flooding in the city of Lumberton.

Plaintiffs allege that "residents and businesses in the southern and western portions of the City" were twice flooded during these hurricanes "when the Lumber River rushed through the ungated [I-95] underpass," which plaintiffs describe as "a gap in the City's levee system where [CSXT's] railroad tracks ran under Interstate 95." Compl. ¶¶ 2–5, 19. The "gap" plaintiffs refer to is CSXT's right-of way, which runs under the highway the state constructed approximately 100 years *after* the rail tracks were laid. Notably, plaintiffs acknowledge that the levee system of which they complain is "the City's levee system": they do not allege that CSXT built, designed, is responsible for, or exercises any control over the levee system in Lumberton.

According to the complaint, several studies were underway following Hurricane Matthew to determine how to reduce damage from floodwaters (none reaching definitive conclusions). *Id.* ¶ 25. The complaint also contends that several days before Hurricane Florence's landfall, CSXT declined requests by city officials for permission to halt rail traffic and "build the temporary berm" across the underpass. *Id.* ¶ 31.[1] On September 14, 2018, North Carolina Governor Roy Cooper issued an emergency order approving construction of the sandbag berm, and local officials built the berm. *Id.* ¶¶ 33, 35. The berm held only until the afternoon of September 17, 2018. *Id.* ¶ 35. Plaintiffs allege that as floodwaters rose during Hurricane Florence, water breached the temporary sandbag berm, and floodwater from the Lumber River flowed through the underpass and onto plaintiffs' land, purportedly damaging their real and personal property. *Id.* ¶ 36.

Plaintiffs contend CSXT owed them a "duty" of unprecedented nature. Specifically, they allege that CSXT owed a duty to "guard against and/or prevent the risk of flooding" through the I-95 railway underpass. *Id.* ¶ 51. The complaint does not allege that any act by CSXT changed

---

[1] While CSXT, like the Court, accepts the factual allegations of the complaint for purposes of this motion, the actual facts are quite different.

the natural course of the floodwater or directed that water onto plaintiffs' properties. Indeed, the complaint alleges *no act by CSXT at all.* Instead, the complaint targets CSXT's design, construction, and maintenance of its track structures and alleges "inaction" by CSXT in "failing to construct a floodgate or take other action that would prevent the flow of Lumber River floodwaters through the I-95 underpass" (despite the report cited by plaintiffs saying that this potential approach is still under study by the state). *Id.* ¶¶ 25, 54. Plaintiffs likewise fault CSXT for inaction (not action) in failing to "build or facilitate the building . . . [of] a temporary berm at the I-95 underpass prior to Hurricane Florence's landfall" (despite their concession that a sandbag berm was in fact built). *Id.* ¶¶ 36, 55.

Based on these allegations, plaintiffs assert common law claims of negligence, public and private nuisance, and trespass. *Id.* ¶¶ 49–70. Plaintiffs seek injunctive relief, compensatory damages, and punitive damages. *Id.* at p. 18. They also seek certification of two classes consisting of residents and businesses, respectively, who were "impacted by the lack of a flood gate" and who suffered damages "due to flooding through [CSXT's] I-95 railway underpass after Hurricanes Matthew and/or Florence." *Id.* at p. 12 (Class Action Allegations).

## LEGAL STANDARD

"To survive a motion to dismiss" under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007)). Plausibility demands more than "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Id.* (citation omitted)). While the Court accepts the well-pled facts of the complaint, it "need not accept the plaintiff's legal conclusions drawn from the facts, nor need it accept unwarranted inferences,

4

unreasonable conclusions, or arguments." *Newman v. Greenville NC Police Dep't & C.D. Atkinson*, No. 4:18-cv-60-BO, 2018 WL 5019379, at *1 (E.D.N.C. Oct. 16, 2018) (Boyle, J.) (citing *Phillips v. Pitt County Mem. Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009)). Rather, the complaint's well-pled "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

## ARGUMENT

Plaintiffs allege that CSXT, a private rail company with tracks in North Carolina, violated unidentified North Carolina tort duties in failing to barricade its tracks during Hurricane Florence, and that CSXT's lack of action caused flooding of plaintiffs' non-adjacent properties when the Lumber River overflowed its banks in the hurricane's wake. Their claims take direct aim at the design, construction, configuration, and maintenance of CSXT's track and surrounding rail structures. Federal rail law is clear: state law claims targeting the design, construction, or maintenance of a railroad's track and surrounding structure, which includes the railway underpass at issue here, are preempted and should be dismissed at the pleading stage.

Preemption aside, plaintiffs do not state a plausible claim for relief. Inaction is not cognizable in North Carolina absent a duty to act; the complaint alleges only inaction; and CSXT does not owe any duty to protect the general public from natural disasters. This infirmity dooms all of plaintiffs' claims, for all require a duty or other obligation to act to protect plaintiffs' properties from the natural flow of hurricane waters – a duty and an obligation that does not exist. Plaintiffs' own allegations that CSXT failed to act also refute that CSXT is responsible for the flooding, negating the causation element essential to each of their claims. Nor does plaintiffs' attempt to recast their negligence claim as one for nuisance or trespass save them from dismissal:

those claims fail for the reasons stated, and because plaintiffs have not and cannot allege that the flooding was the result of an unlawful, unreasonable, or intentional act by CSXT.

## I.     ICCTA Preempts Plaintiffs' Effort To Regulate Interstate Rail Transportation Through State Tort Law.

Plaintiffs' state tort claims are an impermissible attempt to regulate interstate rail transportation, which Congress placed within the exclusive jurisdiction of the Surface Transportation Board ("STB") through the Interstate Commerce Commission Termination Act of 1995 ("ICCTA"), 49 U.S.C. § 10501, *et seq.* Courts have repeatedly held, in settings much like this, that ICCTA (specifically § 10501(b)) expressly preempts state law tort claims that seek to manage or govern the operation of the railroad, including claims challenging the design or construction of a railroad's tracks and surrounding structures. *See, e.g.*, *Friberg v. Kansas City Southern Ry. Co.*, 267 F.3d 439, 443–44 (5th Cir. 2001); *Maynard v. CSX Transportation, Inc.*, 360 F. Supp. 2d 836, 843 (E.D. Ky. 2004); *In re Katrina Canal Breaches Consol. Litig.,* No. 05-4182, 2009 WL 224072, at *5 (E.D. La. Jan. 26, 2009). Because plaintiffs' state-law claims are preempted by federal law, they should be dismissed on the pleadings.

### A.     ICCTA Broadly And Expressly Preempts State Tort Law.

Federal preemption is rooted in the Supremacy Clause of the Constitution: "[T]he laws of the United States . . . shall be the supreme law of the land; . . . anything in the Constitution or laws of any state to the contrary notwithstanding." U.S. Const. art. VI, cl.2. "Pre-emption occurs when Congress, in enacting a federal statute, expresses a clear intent to pre-empt state law…." *La. Pub. Serv. Comm'n v. F.C.C.*, 476 U.S. 355, 368 (1986). "Because federal law is the supreme law of the land, it preempts state laws that 'interfere with, or are contrary to, federal law.'" *Boomer v. AT&T Corp.*, 309 F.3d 404, 417 (7th Cir. 2002) (quoting *Hillsborough Cty. v.*

*Automated Med. Labs., Inc.*, 471 U.S. 707, 712 (1985)). Preempted claims are subject to threshold dismissal. *See, e.g., Friberg*, 267 F.3d at 442; *Maynard*, 360 F. Supp. 2d at 843.

Railroads are subject to the regulatory authority of Congress under the Commerce Clause. *See, e.g.*, *Pittsburgh & Lake Erie R.R. Co. v. Ry. Labor Execs. Ass'n*, 491 U.S. 490, 510 (1989); *Houston, E & W Tex. Ry. Co. v. United States*, 234 U.S. 342, 350–52 (1914). The Supreme Court "repeatedly has recognized the preclusive effect of federal legislation" in the area of railroad regulation. *City of Auburn v. United States*, 154 F.3d 1025, 1029 (9th Cir. 1998). State tort claims, such as those asserted here, are a form of state regulation to which federal preemption applies. *See, e.g.*, *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 521–22 (1992); *see also South Dakota ex rel. S.D. R.R. Auth. v. Burlington N. & Santa Fe Ry. Co.*, 280 F. Supp. 2d 919, 934 (D.S.D. 2003) ("[t]o allow [plaintiff] to seek and recover punitive damages in a state court is to allow almost unlimited state 'regulation'" of rail operations).

Congress initially asserted federal authority over the railroad industry by enacting the Interstate Commerce Act, ch. 104, 24 Stat. 379 (1887), acknowledged as "among the most pervasive and comprehensive of federal regulatory schemes." *City of Auburn*, 154 F.3d at 1029 (citation omitted). Federal regulation of the industry, already sweeping, expanded further in 1995 when Congress enacted ICCTA, 49 U.S.C. § § 10101 *et seq.*, including within ICCTA an express preemption of state "regulation of rail transportation." With its enactment of ICCTA, Congress intended to "significantly reduce state and local regulation of railroads," *Maynard*, 360 F. Supp. 2d at 839. To this end, Congress established the Surface Transportation Board as an agency within the United States Department of Transportation with authority to regulate all aspects of railroad operations. *See* 49 U.S.C. § § 701(a), 702. ICCTA § 10501 reserves for the STB exclusive jurisdiction over:

> (1) transportation by rail carriers, and the remedies provided in this part with respect to rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carriers; and
>
> (2) the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one State,….

49 U.S.C. § 10501(b). Removing all doubt, § 10501 concludes that the STB's jurisdiction over this broad sweep of rail operations is "*exclusive*" and "*preempt[s] the remedies provided under Federal or State law.*" *Id.* (emphasis added).

Courts have long recognized the exceedingly broad reach of ICCTA preemption. *See, e.g.*, *Wis. Cent. Ltd. v. City of Marshfield*, 160 F. Supp. 2d 1009, 1013 (W.D. Wis. 2000) ("It is clear that the ICCTA has preempted *all* state efforts to regulate rail transportation." (emphasis added)); *CSX Transp., Inc. v. Ga. Pub. Serv. Comm'n,* 944 F. Supp. 1573, 1581 (N.D. Ga. 1996) ("It is difficult to imagine a broader statement of Congress' intent to preempt state regulatory authority over railroad operations."); *Friberg*, 267 F.3d at 443 ("[T]he plain language of the statute itself, and in particular its preemption provision, is so certain and unambiguous as to preclude any need to look beyond that language for congressional intent"). As a result, there is no room for states to regulate railroad operations. *Maynard*, 360 F. Supp. 2d at 843. Whenever "a Plaintiff's tort claim directly attempts to manage or govern a railroad's decisions in the economic realm, that claim 'is either wholly federal or nothing at all.'" *Elam v. Kan. City S. Ry. Co.*, 635 F.3d 796, 807 (5th Cir. 2011) (*quoting New Orleans & Gulf Coast Ry. Co. v. Barrois*, 533 F.3d 321, 330 (5th Cir. 2008)). Courts have applied ICCTA to preempt state regulation of rail transportation in a wide variety of settings, covering the broadest array of claims. *See, e.g.*, *Friberg*, 267 F.3d at 444 (ICCTA preempts common law negligence claim); *City of Auburn*, 154 F.3d at 1031 (ICCTA preempts state environmental laws); *South Dakota ex rel. S.D. R.R. Auth.*,

280 F. Supp. 2d at 935 (ICCTA preempts state tort claims for punitive damages and tortious interference).

### B.      Plaintiffs' Claims Are Preempted By ICCTA.

Plaintiffs' complaint seeks to find fault with CSXT's "operation and maintenance of the railway underpass." Compl. ¶ 51. Specifically, plaintiffs claim CSXT should have modified its track structure to install a permanent floodgate, and should have taken direction from third parties as to how and when to cease rail operation in advance of the hurricane so its tracks could be sandbagged to construct a temporary "berm." In short, plaintiffs ask the Court to dictate, through North Carolina tort law, how CSXT operates the railroad and how CSXT designs, constructs, and maintains its tracks and track structures in Lumberton. But Congress has declared that only the STB may do this. *See Maynard*, 360 F. Supp. 2d at 843; *Elam*, 635 F.3d at 805–6.

Courts routinely find that claims challenging the design or construction of track structures impermissibly interfere with rail operations and are thus preempted by ICCTA, including in cases involving flooding from natural disasters. *See, e.g.*, *In re Katrina,* 2009 WL 224072, at *5 (ICCTA preempts state tort claims against CSXT based on post-hurricane flooding); *Pere Marquette Hotel Partners, LLC v. United States*, No. 09-5921, 2010 WL 925297, *4 (E.D. La. Mar. 10, 2010) (ICCTA preempts tort claims challenging CSXT's "design and construction of a railroad crossing at or near the Industrial Canal's flood protection structures"); *Waubay Lake Farmers Ass'n v. BNSF Ry. Co.*, No. 12-4179-RAL, 2014 WL 4287086, *7 (D.S.D. Aug. 28, 2014) (ICCTA preempts claims alleging railroad's failure to upgrade under-track drainage culvert led to flooding of downstream land). As the court stated in dismissing similar claims against CSXT following Hurricane Katrina, "[t]he application of state law negligence principles to assess and evaluate the suitability of the design and construction of a railroad crossing, railroad tracks, and roadbed for railroad tracks qualifies as an attempt at state law 'regulation' in

9

respect to rail transportation." *In re Katrina*, 2009 WL 224072, at *5. ICCTA expressly preempts claims like those asserted here, which seek to impose a duty on a railroad "to alter [rail] facilities" and "carry off surface waters" because such requests "logically would require [the railroad] to halt use of its tracks" and "likely would mean some demolition and rebuilding of its railway and roadbed." *Waubay Lake*, 2014 WL 4287086, at *6.

The courts are not alone in holding claims like those asserted here preempted. Like the courts, the STB recognizes its exclusive dominion over claims related to railroad structures built or designed to control the movement of surface water. Typical is *Thomas Tubbs et al.-Petition for Declaratory Order*, where petitioners filed suit in state court seeking compensation for property damage allegedly caused by BNSF Railway Company in connection with the Mississippi River overflowing its banks. Petitioners claimed the railroad altered the structure and design of the earthen embankment supporting its tracks in anticipation of this flooding, thereby negligently directing additional floodwater onto their adjacent farmland. S.T.B. No. FD 35792, 2014 WL 5508153, *1 (October 31, 2014). The STB responded with a declaratory order on point in this case as well, concluding ICCTA preempts such claims because they would have the effect of "governing or managing transportation related activities on an active rail line." *See id.* at *6–*7. As the STB noted,

> [w]hether [the railroad] took its actions before and during an emergency resulting from a massive flood, as here, or during normal circumstances, state and local regulation of actions based on the railroad's design, construction, and maintenance standards for railroad track are preempted under § 10501(b). This is so even where the attempted regulation is a tort claim under state law, because damages awarded under state tort laws can manage or regulate a railroad as effectively as the application of any other type of state statute or regulation.

*Id.* at *4.

The same logic applies here. Plaintiffs claim CSXT should have designed, constructed, and installed a permanent floodgate structure across its tracks. Compl. ¶ 54. Plaintiffs thus would have the Court use state tort law to regulate CSXT's rail operations and the construction and design of its track structures. *See In re Katrina*, 2009 WL 224072, at *5; *Tubbs*, 2014 WL 5508153 at *6–7. By ICCTA's plain terms, and as found repeatedly in both judicial precedent and STB decisions, the regulation of track construction is exclusively vested in the STB. *See Tubbs*, 2014 WL 5508153, at *7; *Waubay*, 2014 WL 4287086, at *7. The same goes for plaintiffs' alternate theory of liability – that CSXT allegedly refused to construct or aid in facilitating the construction of a temporary berm. Compl. ¶ 55. No matter how temporary (and even though the City of Lumberton in fact constructed such a berm), the forced placement of an obstacle across a rail line is both an alteration of the design of the tracks and railroad structure, and an impermissible interference with CSXT's rail operations.

Plaintiffs' claims premised on North Carolina tort law intrude upon exclusive federal prerogative. The Supremacy Clause forbids this. The claims should be dismissed.

## II. Plaintiffs Do Not And Cannot Plausibly Allege A Duty By CSXT To Protect Lumberton Property Owners From Hurricanes, Or Actionable Conduct By CSXT.

Plaintiffs' negligence claims fail at the threshold for the additional reason that they plead no plausible duty that could sustain them. This is not the first court to face the question of whether a railroad owes a duty to protect members of the public from hurricane-related flooding. In the aftermath of Hurricane Katrina, New Orleans residents sued a host of public and private entities, including CSXT, alleging negligence and other tort claims based on the failure of the city's levee system and the resulting flooding of local homes and businesses. While many of the public defendants faced protracted litigation, Judge Duval of the Eastern District of Louisiana dismissed all claims against CSXT at the pleading stage, concluding the "[p]laintiffs ha[d] not

11

identified any statutory, jurisprudential, or common law imposing on a railroad a general duty to protect the public from flooding." *See* Order and Opinion at *116–119, *In Re: Katrina Canal Breaches Consol. Lit.*, 2007 U.S. Dist. LEXIS 95799 (E.D. La. Dec. 27, 2007) (No. 05-4182). Nothing in North Carolina law compels a different result.

Plaintiffs pleading negligence in this State must allege, with plausibility: (1) the existence of a duty on the part of a defendant; (2) the failure of defendant to perform that duty; and (3) an injury to plaintiff directly and proximately resulting from the defendant's failure to perform the duty. *Clouse v. Gordon*, 115 N.C. App. 500, 508, 445 S.E.2d 428, 432 (1994) (citing *Simpson v. Cotton*, 98 N.C. App. 209, 211, 390 S.E.2d 345, 346 (1990)). The absence of any one of these elements is fatal. *See id.* "If there is no duty, there can be no liability." *Prince v. Wright*, 141 N.C. App. 262, 266, 541 S.E.2d 191, 195 (2000) (internal citations omitted). Plaintiffs' nuisance and trespass claims similarly require, if not duty *per se*, then at least action – specifically, action that is unreasonable, intentional, or otherwise fails some standard of care. *See Pendergrast v. Aiken*, 293 N.C. 201, 216, 236 S.E.2d 787, 796 (1977) (nuisance claims associated with flooding are either based on intentional acts, or negligent or reckless acts); *York Industrial Center v. Michigan Mut. Liability Co.*, 271 N.C. 158, 163, 155 S.E.2d 501, 502 (1967) (absent a "showing of negligence, trespass requires an intentional entry onto the land of another").

Here, the duty element and the action element are missing. North Carolina does not impose on private landowners a generalized legal duty to rescue or protect the property of others, and the imposition of such duties through common law would lead to absurd results whereby every landowner, plaintiffs included, would be liable for failing to mitigate natural disasters. Nor does North Carolina impose action-based liability under nuisance and trespass on parties accused merely of not acting in ways beneficial to plaintiffs.

**A.  CSXT Does Not Owe A Legal Duty To Act To Prevent Naturally Flowing Water From Running Onto Nearby Property.**

As a private landowner, CSXT does not owe a legal duty to act affirmatively to prevent naturally flowing water from running onto neighboring property, much less a duty to intercept and reroute floodwaters during a natural disaster to protect plaintiffs' non-adjacent property. With respect to surface water, North Carolina has long recognized that "[e]ach possessor is legally privileged to make a reasonable use of his land, even though the flow of surface water is altered thereby and causes some harm to others…." *Pendergrast*, 293 N.C. at 216. Liability can be incurred only in some instances of "interference" with the flow of surface waters. *Id.* It is thus action (*i.e.,* "interference"), and not mere inaction, that may trigger a landowner's liability for redirecting the natural flow of water. This is why the case law of North Carolina for well over 100 years, from the Supreme Court and down, focuses on whether there is action by sued landowners – action in the form of interference, or acceleration, or diversion, or increase: absent action, there is no duty, and there can be no liability. *See, e.g.*, *Davis v. Atlantic Coast Line R. Co.*, 277 N.C. 561, 564–65, 42 S.E.2d 905, 908 (1947) (affirming instruction that key to defendant's liability was whether defendant *diverted* the flow of water onto plaintiff's land); *Bruton v. Carolina Power & Light Co.*, 217 N.C. 1, 11–12, 6 S.E.2d 822, 829 (1940) (affirming dismissal where there was no evidence that water discharged onto plaintiff's land was *accelerated* in speed or *increased* in quantity); *Ayers v. Tomrich Corp.*, 17 N.C. App. 263, 268, 193 S.E.2d 764, 768 (1973) (granting new trial where evidence did not show that the flow of water discharged onto plaintiff's land was *diverted* from its natural flow).

Here, plaintiffs do not allege that any act by CSXT interfered with the natural flow of floodwater from the Lumber River. They allege the opposite: that hurricane floodwaters flowed

naturally, and CSXT failed to reconfigure its land to stop Mother Nature. Compl. ¶¶ 53–55. Under settled North Carolina law, this is not actionable.

The North Carolina Supreme Court has "repeatedly held that there is appurtenant to all lands a natural easement, entitling the owner to discharge surface water in its natural course, regardless of the ownership of the lower lands[.]" *Lassiter v. Norfolk & C.R. Co.*, 126 N.C. 509, 511, 36 S.E. 48, 48 (1900). "As long as the drainage results in carrying the water along the natural course the servient proprietor may not complain, even though natural barriers on the higher land have been cut down and the flow of water both accelerated and increased." *Davis*, 42 S.E.2d at 909; *see also Ayers*, 193 S.E.2d at 768. Absent an affirmative act by the upper land owner diverting the water such that the natural flow changes, no negligence occurs. Plaintiffs admit that CSXT took no action to alter or divert the natural flow of Hurricane Florence's floodwaters in any way; indeed, the absence of action, a fatal flaw in this case, is the very premise of plaintiffs' claims.

### B. Imposing A Duty On Private Landowners To Protect Plaintiffs From Hurricanes Would Lead To Absurd And Undesirable Results.

In the words of the North Carolina Supreme Court: "We know of no principle of law that imposed upon the defendant the legal duty to protect and rescue plaintiff's chattels from the destructive consequences of an act of God." *Matthews v. Carolina & N.W.R. Co.*, 175 N.C. 35, 36, 94 S.E. 714, 714 (1917); *see also Bruton*, 6 S.E.2d at 828 ("Nothing appears to be more settled than that the owner of a dam . . . is not liable for damages resulting from extraordinary storms and floods."). There is good reason why the law does not impose generalized duties on private landowners to protect one another from natural disasters. Plaintiffs' liability theory would effectively require CSXT and other private landowners to be flood control experts for the Lumber River, imposing an affirmative duty on CSXT to prevent flooding both adjacent to and

far from CSXT's own land. Courts have long recognized the flaw in imposing such an affirmative duty on a private individual or entity. *See* Section I.A., *surpra. Cf. Fleming v. Atl. C.L.R. Co.*, 236 N.C. 568, 573, 73 S.E.2d 544, 548 (1952) ("[A] railroad company using coal burning engines as the motive power for its trains is not an insurer against loss to adjoining property occasioned by the escape of fire from its engines."); *Lampkin ex rel. Lampkin v. Housing Mgmt. Resources, Inc.*, 220 N.C. App. 457, 464, 725 S.E.2d 432, 437 (2012) (a landowner is not a comprehensive insurer of the safety of persons on its premises and "certainly is not an insurer of the safety of persons off the premises").

The consequences of imposing such a duty would be absurd, and untenable. Under plaintiffs' theory, every private landowner in a storm's path could presumably be sued by his neighbors – and even his non-neighbors – for not erecting floodgates or building sandbag barriers along his property line to stop or divert floodwaters. It would also place private landowners in the impossible position of making value judgments about which properties to protect and which to subject to further risk. CSXT would find itself making public policy decisions about which land is best safeguarded, and precisely how, and of needing somehow to coordinate with all other landowners simultaneously compelled to make the very same policy judgments and choices. This cannot be the law. And it is not the law.

Illustrating the point, scores of property owners upstream have recently sued the State of North Carolina and City of Lumberton for sandbagging under the I-95 overpass during Hurricane Florence, alleging that the temporary barricade prevented floodwaters from dispersing along their natural path away from their properties. *See, e.g.*, Complaint, *Townsend v. State of N. C. and City of Lumberton* (N.C. Super. Ct. Oct. 2, 2018) (No. 18CV 2490) (Ex. 1). In other words, the State and City are being sued for taking the very actions that plaintiffs here say CSXT should

have taken.[2] Under plaintiffs' "duty to the public" theory, a private landowner could be held liable in both situations, producing the absurd result of assuring the liability of all private landowners who acted and who did not act to prevent the effects of nature.

This is not to say plaintiffs are left to their own devices in protecting their properties from natural disasters, only that any duty to protect does not lie with CSXT. North Carolina state and local governments are statutorily charged with "prevention of, preparation for, response to, and recovery from natural or man-made emergencies," including "[r]educ[ing] vulnerability of people and property of this State to damage, injury, and loss of life and property," and "emergency mitigation, preparedness, response, and recovery." *See* § 166A-19.1, North Carolina Emergency Management Act (1977). In keeping with this statutory charge, the State of North Carolina and the city of Lumberton—not CSXT—can and do construct and maintains levees, build temporary berms, and order evacuations to protect people and property from natural events (and in fact did so here). Compl. ¶ 20. Plaintiffs are well aware of this. They allege that the City (not CSXT) built the levee containing the "gap," that North Carolina's Governor (not CSXT) issued an order authorizing construction of a sandbag berm across the CSXT tracks, and that local officials and the National Guard (not CSXT) were tasked with constructing that berm. *Id.* ¶¶ 19, 33, 35.

For good and obvious reasons, these public policy choices are vested in *public* authorities, not private landowners. The law does not and should not designate private landowners like CSXT as decision-makers in such matters of policy.

---

[2] CSXT notes this merely as illustrative, and would not ask the court do more than take judicial notice of the fact of the other lawsuits being filed. *See Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009) ("[A] court may properly take judicial notice of 'matters of public record'"); *Johnson v. United Parcel Serv., Inc.*, No. CV ELH-17-1546, 2018 WL 2237469, at *9 (D. Md. May 16, 2018) (documents filed in a separate case were publicly available and thus judicially noticeable).

### C.  The Action Requirement Of Nuisance and Trespass Is Lacking.

Plaintiffs cannot evade this fatal flaw by repackaging their negligence claims under the doctrine of "nuisance" or "trespass." Claims of nuisance and trespass likewise require action by a defendant of a sort falling below a standard of care. Nuisance requires action that causes loss of use and enjoyment of one's property. *Pendergrast,* 293 N.C. at 216; *Elliott v. Muehlbach*, 173 N.C. App. 709, 712, 620 S.E.2d 266, 269 (2005). And trespass requires action that invades another's property. *Shadow Grp., LLC v. Heather Hills Home Owners Ass'n*, 156 N.C. App. 197, 201, 579 S.E.2d 285, 285 (2003); *York Industrial Center*, 271 N.C. at 163. In assessing such claims, then, courts look for offending conduct, and determine whether that conduct is unreasonable, or intentional, or interfering, or invasive.

The Court will find no such conduct alleged in the complaint. For, as shown above, the complaint alleges *no conduct at all* by CSXT. For all the reasons just given, and as underscored below in the particular settings of these torts, the nuisance and trespass claims also fail as a matter of law.

### III.  Plaintiffs Cannot Plausibly Establish Causation.

Causation is another essential element of all of plaintiffs' tort claims. *See Clouse*, 115 N.C. App. at 508 (negligence); *Twitty v. State*, 85 N.C. App. 42, 49, 354 S.E. 2d 296, 301 (1987) (public nuisance); *Elliott*, 173 N.C. App. at 712 (private nuisance); *Shadow Grp.,* 156 N.C. App. at 201 (trespass). Since the complaint does not allege that CSXT acted, by definition CSXT did not act causally sufficient to sustain plaintiffs' claims.

Moreover, plaintiffs' causation theory boils down to the conclusory notion that despite the destructive force of Hurricane Florence, their properties would not have flooded had CSXT built a temporary berm along its tracks that pass under I-95 or installed a permanent floodgate. Compl. ¶¶ 59, 61, 67. Not only are there no facts pleaded in the complaint suggesting this is even

possibly the case, plaintiffs' assertion is belied by their own allegations. Plaintiffs concede that once approved by the Governor of North Carolina, a sandbag berm *was* constructed across the CSXT railway on September 14, 2018; that the berm held for three days; and that the flood waters *eventually broke through*. *Id.* ¶¶ 33, 35. Plaintiffs allege, in short, that flooding of their property was all but a foregone conclusion – not surprising given the torrential force of Hurricane Florence. Plaintiff's alleged injuries were not directly or proximately caused by CSXT's action or inaction. They were caused by a hurricane.

Courts faced with equally untenable and unsupported causation contentions dismiss claims like these. *See, e.g., Comer v. Murphy Oil USA, Inc.,* 839 F. Supp. 2d 849, 868 (S.D. Miss. 2012), *aff'd,* 718 F.3d 460 (5th Cir. 2013) (dismissing claims in part because the causal link between alleged harms and defendants' actions was too remote to satisfy the requirements of proximate cause); *Litowsky v. Asco Power Techs., L.P.*, 4 F. Supp. 3d 328, 330 (D. Mass. 2014) (same); *In re Tobacco/Governmental Health Care Costs Litig.*, 83 F. Supp. 2d 125, 129 (D.D.C. 1999), *aff'd sub nom. Serv. Employees Int'l Union Health & Welfare Fund v. Philip Morris Inc.*, 249 F.3d 1068 (D.C. Cir. 2001) (same).

## IV. Plaintiffs' Nuisance and Trespass Claims Fail For Additional And Independent Reasons.

Plaintiffs appear to assert both public and private nuisance claims, lumped together as their "second claim for relief," and a third claim for trespass. Plaintiffs do nothing to distinguish allegations supporting a theory of negligence from those supporting public nuisance from those supporting private nuisance from those supporting trespass. All claims are predicated on the same theory: that CSXT was "aware of the risk of flooding created by their I-95 underpass" but took no action to "construct a floodgate or take other action that would ensure the Lumber River

18

floodwater would not breach the City's levee system by flowing through the underpass." Compl. ¶¶ 61–62, 67.

As detailed above, these claims fail in the first instance because (i) they are preempted; (ii) CSXT was under no duty, obligation, or requirement to protect plaintiffs from flooding caused by a natural disaster; and (iii) plaintiffs cannot plausibly allege causation by CSXT. But there is more.

### A.      Plaintiffs Do Not State a Claim for Public Nuisance.

North Carolina law provides that a public nuisance exists

> wherever acts or conditions are subversive of public order, decency, or morals, or constitute an obstruction of public rights. *Such nuisances always arise out of unlawful acts*. A public nuisance affects the local community generally and its maintenance constitutes an offense against the State. To constitute a public nuisance, the condition of things must be such as injuriously affects the community at large, and not merely one or even a very few individuals....

*Twitty*, 85 N.C. App. at 49 (emphasis added) (citations and quotations omitted).

To the extent their nuisance claim asserts public nuisance, plaintiffs endeavor to hold a lawful commercial enterprise accountable for allegedly interfering with a public right. Courts routinely dismiss such claims as facially invalid. *See, e.g., Am. Elec. Power Co. v. Connecticut*, 564 U.S. 410, 429 (2011) (dismissing public nuisance claim against power company for contributing to global warming); *Allegheny Gen. Hosp. v. Philip Morris, Inc*., 228 F.3d 429, 446 (3d Cir. 2000) (dismissing public nuisance claim against tobacco companies by patients suffering tobacco-related disease); *City of Philadelphia v. Beretta U.S.A. Corp*., 277 F.3d 415, 426 (3d Cir. 2002) (dismissing public nuisance claim against gun manufacturers for recovery of costs associated with the criminal use of handguns); *Penelas v. Arms Tech., Inc*., No. 99-1941 CA-06,

1999 WL 1204353, at *4 (Fla. Cir. Ct. Dec. 13, 1999) (same), *aff'd*, 778 So. 2d 1042 (Fla. Dist. Ct. App. 2001). Several deficiencies compel the same result here.

First, plaintiffs do not allege that CSXT committed an unlawful act, which is required to state a claim for public nuisance in North Carolina. *Twitty*, 85 N.C. App. at 49. As explained above, CSXT had no statutory or common law duty to build a floodgate or to take other action to prevent flooding from a natural disaster, and federal law bars the state from imposing such a duty on this railroad entity. There is nothing unlawful about CSXT operating trains or owning track, even if the City elected to build a levee system around those tracks. Nor is there anything unlawful about not doing something CSXT was under no legal obligation to do.

Second, plaintiffs do not allege a "special injury," that is, injury different in kind from that suffered by the public at large during this hurricane. An individual may sue in public nuisance only if "he has received a special damage or unless the creator of the nuisance has thereby invaded some right which, upon principles of justice and public policy, cannot be considered merged in the general public right." *Neuse River Found, Inc. v. Smithfield Foods, Inc.*, 155 N.C. App. 110, 115, 574 S.E. 2d 48, 52 (2002). "[S]pecial damage is defined as the invasion of a more particular and more personal right that cannot be considered merged in the general public right." *Id.* at 115. While plaintiffs summarily declare that they suffered injuries to their properties "in a manner that is special to [the] properties in their location, and not shared by, the general public," the injuries they actually allege – "damage to and destruction of home, businesses, and other property; loss of business; and evacuation from their homes and businesses" – are no different than the damage suffered by other members of the public whose property was flooded during Hurricanes Matthew or Florence. Compl. ¶¶ 64–65. Plaintiffs

20

reliance on mere "labels and conclusions" to satisfy the special injury element does not save their claim. *Twombly*, 550 U.S. at 555.

**B.      Plaintiffs Do Not State a Claim for Private Nuisance.**

A private nuisance is (i) an unreasonable non-trespassory interference with the use and enjoyment of the property of another, which (ii) because of the unreasonable conduct there has been substantial injury and loss of value to plaintiff's property.  *Elliott,* 173 N.C. App. at 712.

Plaintiffs decree it was an "unreasonable interference with the use and enjoyment of Plaintiffs'… properties" for CSXT not to "construct a floodgate or take other action to ensure that Lumber River flood waters would not breach the City's levee system." Compl. ¶ 61, 63. At the most fundamental level, plaintiffs' private nuisance claim fails because they allege no "interference" by CSXT with their property rights. In fact, they allege *non-interference*: their contention is that CSXT should have interfered to alter the flow of floodwaters for their own benefit (whatever the effect on others), to protect their own property (as opposed to the property of others) from the natural course of the flood.

Moreover, plaintiffs' conclusory claim of "unreasonable" *inaction* is belied by plaintiffs' own factual allegations, which reflect that state and local officials were still discussing how to mitigate the type of flooding that occurred during Hurricane Matthew when Hurricane Florence hit North Carolina less than two years later. Specifically, plaintiffs allege it was not until 2016, "[f]ollowing Hurricane Matthew," that CSXT "actually knew that flood waters flowing unimpeded through their I-95 underpass would cause [damage]." Compl. ¶¶ 21, 62. And plaintiffs admit that in 2017 and 2018, government studies and plans for mitigating flooding in Lumberton were still being developed. *Id*. ¶ 23 (referencing the May 2017 Resilient Redevelopment Plan for Robeson County) and ¶ 25 (referencing the North Carolina Department of Transportation and North Carolina Emergency Management's May 2018 Lumber River Basin

Flood Analysis and Mitigation Strategies Study). Finally, plaintiffs admit that as of May 2018, "plans were underway for the installation of a floodgate." *Id.* ¶ 25. The fact that the design and implementation of a major construction project involving multiple public and private entities was, by plaintiffs' own account, not complete in September 2018 dispels plaintiffs' theory of "unreasonable interference."

Nor can plaintiffs state a plausible claim of "unreasonableness" where CSXT barricading its tracks with sandbags would have usurped the role of flood protection bodies, interfered with its rail operations, and potentially done damage to its track structures. As shown above, CSXT does not have a duty to redirect floodwater or to take any other action to prevent flooding from a natural disaster. And the complaint nowhere alleges it was unreasonable for CSXT, a private entity, to let state and local officials – the true holders of flood protection obligations – be the ones to decide how to address whatever vulnerabilities may exist in the city's levee system.

Plaintiffs are required to allege not just the buzzwords of a cause of action, but facts sufficient to state a *plausible* claim for relief. *Twombly*, 550 U.S. at 570. Plaintiffs' failure to do so dooms their private nuisance claim.

### C. Plaintiffs Allege No Intentional Act by CSXT To Support A Claim Of Trespass.

Plaintiffs' trespass claim fails because plaintiffs allege no intentional act by CSXT that caused flooding of their properties. Trespass is an intentional tort. An action for trespass under North Carolina law must be predicated upon (1) an unauthorized and therefore unlawful physical entry by the defendant (2) onto the plaintiff's property (3) causing damage. *Shadow Grp.,* 156 N.C. App. at 201. An unlawful physical entry can either be an intentional invasion of another's property, or an intentional act that contributed to that invasion. *See id.*; *Rainey v. St. Lawrence*

*Homes, Inc.*, 174 N.C. App. 611, 614–15, 621 S.E.2d 217, 220 (2005) (to state a trespass claim, "the defendant's entry must be intentional").

Here, plaintiffs allege the *opposite* of what is required for trespass. According to the complaint, the "flooding of Plaintiffs' … properties through [CSXT's] I-95 underpass constitutes an intermittent trespass diverting floodwaters onto Plaintiffs' …properties." Compl. ¶ 70. Plaintiffs contend this alleged trespass was caused not by intentional action on CSXT's part, as required, but by the absence of intentionality and the absence of action – that is, by CSXT's *failure* to halt or divert floodwater. In plaintiffs' words: CSXT is being sued for alleged "failure… to construct a floodgate or take other action to ensure that Lumber River floodwaters would not breach the City's levee system." *Id*. ¶ 67. No intentional act by CSXT is alleged.

Indeed, the complaint confirms that CSXT did not intentionally act to route floodwaters onto plaintiffs' properties. Plaintiffs admit that when the city's levee system was constructed in 1977, a gap remained "where the Defendants' railroad tracks ran under Interstate 95." *Id*. ¶ 19. This gap in the levee exists because the City of Lumberton built the levee around CSXT's *pre-existing* railroad and left a gap for the trains to run through (and also for the other public roadway that runs parallel to the tracks). There are no allegations, nor could there be, that CSXT created or altered the levee system or changed the natural flow of floodwaters. The absence of an intentional act is fatal to plaintiffs' claim of trespass. *Cf. Rainey*, 174 N.C. App. at 611 (trespass based on surface water run-off that resulted from defendant *intentionally building a subdivision* that was likely the cause of increase run-off); *Shadow Grp.,* 156 N.C. App. at 201 (trespass based on water running from common areas of a subdivision owned by defendant onto plaintiffs' property and into his home, where *defendant's intentional attempt to remedy the water flow*

23

*problem* by installing a new drainage system adjacent to plaintiffs' property exacerbated the water flow problem).

## **CONCLUSION**

Respectfully, all claims against CSXT should be dismissed.

November 30, 2018.

Respectfully submitted,

/s/ April N. Ross
April N. Ross
N.C. State Bar No. 35478
Scott L. Winkelman
Crowell & Moring LLP
1001 Pennsylvania Avenue NW
Washington, D.C. 20004
Telephone: (202) 624-2500
Facsimile: (202) 628-5116
Email: aross@crowell.com
Email: swinkelman@crowell.com

*Counsel for CSX Transportation, Inc. by Special Appearance*

/s/ Henry L. Kitchin, Jr.
Henry L. Kitchin, Jr.
N.C. State Bar No. 23226
McGuireWoods LLP
Post Office Box 599 (28402)
Wilmington, North Carolina 28401
Telephone: (910) 254-3800
Facsimile: (910) 254-3900
Email: hkitchin@mcguirewoods.com

*Counsel for CSX Transportation, Inc.*