# EXHIBIT #1

NORTH CAROLINA                      IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
ROBESON COUNTY                      FILE NO.: 18CV 2490

FILED 2018 OCT -2 AM 11: ROBESON COUNTY, C.S.C.

| | |
|---|---|
| VELTON RAY TOWNSEND and wife, ) <br> DEBRA ANN TOWNSEND, ) <br>          Plaintiffs, ) <br> ) <br> vs. ) <br> ) <br> STATE OF NORTH CAROLINA and ) <br> CITY OF LUMBERTON, ) <br>          Defendants ) <br> ) | **COMPLAINT** |

NOW COME the Plaintiffs, by and through counsel, and complaining of the Defendants, hereby depose and say:

**FIRST CAUSE OF ACTION**
**(Inverse Condemnation)**

1. The Plaintiffs are citizens and residents of Robeson County, North Carolina residing on the property which is the subject of this lawsuit, which is referred to hereinafter as the "Subject Property" and sometimes the "Plaintiffs' Property".

2. The Subject Property is owned by the Plaintiffs and is subject to a Deed of Trust in favor of First Bank; its address is 106 Stirling Drive.

3. The Subject Property is more particularly described in the Memorandum of Action which will be filed contemporaneously herewith.

4. Defendant, the State of North Carolina, hereinafter "State", is one of the fifty principal governmental entities comprising the United States of America which derives its power from its citizens through the operation of law.

5. The State has numerous governmental responsibilities, powers and constraints as enumerated in its Constitution and General Statutes; it also being subject to the provisions of the United States Constitution.

6. As provided for in N.C. Gen. Stat. §166A-19.1, the Governor, state agencies and local governments have certain duties related to emergencies, among them are: to reduce vulnerability of the people and property of this State to damage, injury and loss of life and property during emergencies and to provide for cooperation and coordination of activities relating to emergency mitigation, preparedness, response and recovery among agencies and officials of the State and local governments.

7. The State has the power to acquire property by purchase, gift or eminent domain.

8. N.C. Gen. Stat. §146-22, et. seq. provides that every acquisition of land on behalf of the State or any State agency, with certain exceptions, is to be made by the Department of Administration with the approval of the Governor and Council of State.

9. In the event the State needs to acquire a fee or lesser interest in property by condemnation, the procedures and relevant law for the Department of Administration doing so is provided for in N.C. Gen. Stat. §146-24 and N.C. Gen. Stat. §146-24.1.

10. In doing so, the Department of Administration is subject to the provisions of Article 9 of Chapter 136 of the General Statutes, which is the governing law for condemnation specified for the North Carolina Department of Transportation, but also, by reference, the Department of Administration.

11. N.C. Gen. Stat. §136-111 states, in part:

Any person whose land or compensable interest therein has been taken by an intentional or unintentional act or omission of the Department of Transportation [and by reference, the Department of Administration] and no complaint and declaration of taking has been filed by said Department of [Administration] may,

2

within 24 months of the date of the taking of the affected property or interest therein or the completion of the project involving the taking, whichever shall occur later, file a complaint in the superior court. . .

12. This statute is a statutory waiver of sovereign or governmental immunity.

13. The Defendant, City of Lumberton, is a Municipal Corporation of the State of North Carolina located in Robeson County, North Carolina, hereinafter "City".

14. As such, the City is authorized to acquire "the fee or lesser interest" in real property by eminent domain pursuant to N.C. Gen. Stat. §160A-240.1 and as governed by Chapter 40A of the North Carolina General Statutes.

15. The City, pursuant to N.C. Gen. Stat. §40A-3(4), is authorized to condemn interest in property to establish, extend, enlarge or improve storm sewer and drain systems and works.

16. The City, pursuant to N.C. Gen. Stat. §40A-3(7), is authorized to condemn interest in property to establish drainage programs and programs to prevent obstructions to the natural flow of streams, creeks and natural water channels or improving drainage facilities.

17. N.C. Gen. Stat. §40A-51 provides a right and procedure whereby if the City takes an interest in property by an act or omission and no complaint containing a declaration of taking has been filed:

> . . . the owner of the property, may initiate an action to seek compensation for the taking. The action may be initiated within 24 months of the date of the taking of the affected property or the completion of the project involving the taking, whichever shall occur later.

18. This statute is a statutory waiver of sovereign or governmental immunity.

19. On information and belief, sometime before or around October 3, 2016, the State or the City, or both of them acting collaboratively, began a project to address potential flooding in certain neighborhoods within the City of Lumberton.

20. One of the options for this project was developing a method for preventing storm or flood water from moving downstream in the area of the CSX and VFW Road (sometimes referred to as Cox Road) underpass under Interstate 95 in the City of Lumberton, by emplacing structures there to impede and divert storm water, hereinafter the "Underpass Project".

21. The Underpass Project involves placing structures on or near the underpass to obstruct the natural flow of water in certain flood situations, thereby diverting water onto other properties such as the property owned by the Plaintiffs.

22. Hurricanes, such as Matthew and Florence, are predictable and reoccurring events and in September of 2016, it became apparent that Hurricane Matthew would affect portions of North Carolina including the City of Lumberton.

23. On October 3, 2016, the Honorable Pat McCrory, as Governor of the State, issued a Declaration of a State of Emergency related to Hurricane Matthew for numerous counties in the State including Robeson County.

24. This type of Declaration, under certain circumstances, provides the State additional powers, pursuant to N.C. Gen. Stat. §160A-19.30 to, among other things, utilize all available state resources as reasonably necessary to cope with an emergency, to perform and exercise such other functions, powers, and duties as are necessary to promote and secure the safety and protection of the civilian population and to procure by purchase, condemnation, seizure or other means facilities for emergency management without regard to the limitation of any existing law.

4

25. As a part of this Declaration, the Governor delegated "to Frank L. Perry, the Secretary of Public Safety, or his designee, all power and authority granted to me and required of me by Article 1A of the General Statutes for the purpose of implementing the State's Emergency Operations Plan and deploying the State Emergency Response Team to take the appropriate actions as is necessary to promote and secure the safety and protection of the populace in North Carolina."

26. On information and belief, the City also made certain emergency declarations or decisions which, in part, authorized the sandbagging and construction of a berm at or near the CSX and VFW Road underpass as an initial step in the Underpass Project or for other reasons.

27. On information and belief, the City, by and through its employees, contractors, volunteers or otherwise, began the aforementioned sandbagging and construction of the berm at or near the CSX and VFW Road underpass, diverting water onto other properties such as the Plaintiffs.

28. On information and belief, the State, by and through its employees, contractors or volunteers, was also involved in building these structures to obstruct the natural flow of the storm water, diverting it onto other properties such as the Plaintiffs.

29. The structures built by the City, or the City and the State, during the initial phases of Hurricane Matthew constituted a dam impeding and diverting the natural flow of waters and causing the waters to back up and flood the Plaintiffs' property causing substantial and measurable damage thereto.

30. The right to have water flow in the direction provided by nature is a property right, and if such right of a landowner is materially interfered with so that his land is flooded by

5

the manner in which the structure is constructed by a governmental entity, the property owner has a legal right of recovery; *sic utere tuo, ut alieum non laedas*.

31. Once the cause of action has occurred by the infliction of damage to the property, the taking is a *fait accompli*.

32. This impoundment on the Subject Property was in the nature of a temporary or permanent drainage easement and constituted a taking.

33. A drainage easement for impounding water is a taking which can be permanent or temporary.

34. Under North Carolina Law, a "taking" is defined as entering upon private property for more than a momentary period, and under warrant or color of legal authority, devoting it to a public use, or otherwise informally appropriating or injuriously affecting it.

35. A private nuisance or trespass and a governmental taking may appear similar in effect, but when a governmental authority is the actor, it is considered a taking under eminent domain law.

36. Although a permanent drainage easement is considered a "lesser interest" in property than "fee ownership", in certain instances, they are valued in the same manner.

37. Under North Carolina Law, a "temporary taking" which denies a landowner use of his or her property for a finite period, is no different in kind from a permanent taking, and requires just compensation for the use of the land during the period of the taking, including any "costs to cure" and other related components of just compensation.

38. Our Supreme Court has said:

> There is no difference of kind, but only of degree, between a permanent condition of continual overflow by back-water and a permanent liability to intermittent but inevitably recurring overflows; and, on principle, the right to compensation must arise in the one case as in the other. If any substantial enjoyment of the land still

remains to the owner, it may be treated as a partial instead of a total divesting of his property in the land. The taking by condemnation of an interest less than the fee is familiar in the law of eminent domain. *United States v. Cress*, 243 U.S. 316, 328-329, 61 L.Ed. 746, 753, 37 S.Ct. 380, 385 (1917).

Lea Co. v. North Carolina Bd. of Transp., 308 N.C. 603, 304 S.E.2d 164 (1983)

39. The aforesaid impounding of water on the Subject Property lasted until the structures obstructing the natural flow of water emplaced by the City, or the City and the State, failed and was breached but reoccurred as further alleged hereinbelow.

40. At that point, the waters began to recede.

41. During the latter phases of Hurricane Matthew, after the breach of the governmentally-emplaced damming structures, no additional flooding occurred even though the overall volume of water in its natural channel increased.

42. Likewise, in previous storms, such as Hurricane Fran, when no obstructions were emplaced at or near the CSX and VFW Road underpass, the Subject Property had not suffered from flooding related to the Lumber River.

43. After Hurricane Matthew, the Plaintiffs repaired or attempted to repair the damage to their property caused by the Defendants' actions as alleged hereinabove.

44. After Hurricane Matthew, as a part of a larger project, a study was published at the direction of the State which addressed the ongoing concerns of the Underpass Project, its title being "Lumber River Basin Flood Analysis and Mitigation Strategies Study".

45. In one portion of the study, a conceptual drawing of the view of the VFW Road and CSX Railroad Underpass Floodgate was developed; this being a proposed permanent structure in the Underpass Project. (See Exhibit A attached hereto and incorporated herein by reference.)

46. Also, in furtherance of the Underpass Project, the Defendants have continued to work on the permanent solution; for example, the City has secured a $1.25 million grant to build floodgates at the underpass.

47. However, in several sections of the aforementioned study, is the warning stating a "detailed 2-dimensional modeling should be performed for the complex hydrologic and hydraulic situations in the Lumberton area, before further structural mitigation options are pursued."

48. The study was published by the State on May 1, 2018 and, on information and belief, shared with the City providing the State and the City either actual or constructive knowledge of the potential harm to property owners such as the Plaintiffs if the Defendants place structures on or near the CSX and VFW Road underpass to impede or divert storm water; this is particularly true in light of the previous flooding caused to neighborhoods similarly situated to the Plaintiffs by the Defendants' previous structures at or near the CSX and VFW Road underpass.

49. On information and belief, the Defendants, nonetheless, continued their efforts with the Underpass Project.

50. However, between Hurricane Matthew and Hurricane Florence, the Defendants were unable to obtain permission from CSX, the entity holding a property interest in the underpass, to build the aforesaid floodgate on its property; in other words, the completion of the Underpass Project was delayed.

51. In the first week or so of September, 2018, it became apparent that Hurricane Florence was going to be a significant weather event affecting, among other areas, the City of Lumberton.

8

52. During this period of time, the City requested access to the CSX property to further its efforts in the Underpass Project, but was denied.

53. As Hurricane Florence came closer, the City requested North Carolina Governor Roy Cooper to intervene with CSX to allow work on the project to proceed on or near the CSX and VFW Road underpass.

54. On information and belief, at some point, formal eminent domain action was discussed or threatened either by the State or the City.

55. On Friday, September 14, 2018, Governor Cooper issued an emergency order "greenlighting" the continued prosecution of the Underpass Project by sandbagging, berming, or use of other structures to impede or divert storm water; a detailed summary of the Governor's action is contained in a letter from his General Counsel to the City Attorney, attached hereto and incorporated herein by reference as Exhibit "B".

56. Pursuant to the Governor's directive, as requested by the City, the State and the City began the impoundment process.

57. Once again, as could reasonably be expected, the Plaintiffs' property was flooded by the Underpass Project, being taken by the State, the City or a combination of the two as a drainage easement or impoundment area; the damage thereby equaling or exceeding the previous damage caused by the Defendants.

58. Once again, the installed structures of the Underpass Project failed and, once again, after the breach, the water began to recede from the Subject Property.

59. Once again, during the latter phases of Hurricane Florence, after the breach of the governmentally-emplaced damming structures, no additional flooding occurred even though the overall volume of water in its natural channel increased.

60. The Subject Property suffered substantial and measurable damage as a result of the taking which entitles the Plaintiffs to just compensation as provided for by law, i.e., the Plaintiffs' interest in the Subject Property has been impaired by this exercise of eminent domain.

61. The increased overflow of water, as noted in all three stages of the Underpass Project (Hurricane Matthew phase, Hurricane Florence phase, ongoing floodgate phase, etc.) was, and will be, such as to be reasonably anticipated by the Defendants to be the direct result of any structures on or near the CSX and VFW Road underpass as built or as planned to be built.

62. At no time has the State or the City filed condemnation pleadings related to the Subject Property against the Plaintiffs.

63. As shown above, a substantial and ongoing interest in the Plaintiffs' property has been taken by the City, the State or both of them on or directly after October 3, 2016 when the effects of their actions was evident on the Subject Property; this was by way of inverse condemnation and the effects are, and will be, reoccurring as the Underpass Project continues to moves forward.

64. The Plaintiffs have an inverse condemnation claim against the State or the City or both.

65. The Plaintiffs are therefore entitled to just compensation as prescribed by law, including, but not limited to a monetary award for the property interests taken, any "cost to cure", interest as prescribed by law from the date of taking, the cost of court including a reasonable attorney fee and reimbursement for engineering, appraisal or other expert witness expenses.

10
Case 7:18-cv-00178-BO   Document 25-1   Filed 11/30/18   Page 11 of 20

## SECOND CAUSE OF ACTION
### Constitutional Claim

66. This cause of action is plead in the alternative, and the allegations in paragraphs 1-65 above are realleged and incorporated herein by reference as if fully set forth therein.

67. N.C. Gen. Stat. §160A-19.60(a) reads as follows:

Generally. -- All functions hereunder and all other activities relating to emergency management as provided for in this Chapter or elsewhere in the General Statutes are hereby declared to be governmental functions. Neither the State nor any political subdivision thereof, nor, except in cases of willful misconduct, gross negligence, or bad faith, any emergency management worker, firm, partnership, association, or corporation complying with or reasonably attempting to comply with this Article or any order, rule, or regulation promulgated pursuant to the provisions of this Article or pursuant to any ordinance relating to any emergency management measures enacted by any political subdivision of the State, shall be liable for the death of or injury to persons, or for damage to property as a result of any such activity.

68. This statute or other similar defenses may be raised in an effort to defeat the Plaintiffs' just and rightful claims.

69. However, the North Carolina Constitution in Article I, Section 7, states: "All power of suspending laws or the execution of laws by any authority, without the consent of the representatives of the people, is injurious to their rights and shall not be exercised."

70. Furthermore, our Supreme Court has said "[a] nuisance maintained by a governmental agency impairing private property is a taking in the constitutional sense" and "permanent liability to intermittent, but inevitably recurring, overflows constitutes a taking."

71.

Our [North Carolina] Constitution, Article I, section 17, guarantees payment of compensation for property taken by sovereign authority. *Braswell v. Highway Commission, supra; DeBruhl v. Highway Commission*, 247 N.C. 671, 102 S.E. 2d 229; *Ivester v. Winston-Salem*, 215 N.C. 1, 1 S.E. 2d 88.

Midgett v. North Carolina State Highway Com., 260 N.C. 241, 249-50, 132 S.E.2d 599, 608 (1963)

72.

A constitutional prohibition against taking or damaging private property for public use without just compensation is self-executing, and neither requires any law for its enforcement nor is susceptible of impairment by legislation. And where the Constitution points out no remedy and no statute affords an adequate remedy under a particular fact situation, the common law will furnish the appropriate action for adequate redress of such grievance. *Sale v. Highway Commission*, 242 N.C. 612, 89 S.E. 2d 290.

Midgett v. North Carolina State Highway Com., 260 N.C. 241, 250, 132 S.E.2d 599, 608 (1963).

73. A statute cannot defeat a constitutional cause of action (North Carolina and United States) designed to protect private property from governmental takings.

74. Our Supreme Court has stated:

We recognize the fundamental right to just compensation as so grounded in natural law and justice that it is part of the fundamental law of this State, and imposes upon a governmental agency taking private property for public use a correlative duty to make just compensation to the owner of the property taken. This principle is considered in North Carolina as an integral part of "the law of the land" within the meaning of Article I, Section 19 of our State Constitution. *Long v. City of Charlotte*, 306 N.C. 187, 196, 293 S.E. 2d 101, 107-108 (1982).

Lea Co. v. North Carolina Bd. of Transp., 308 N.C. 603, 304 S.E.2d 164 (1983).

75. These protections from governmental takings are also contained in the Fifth Amendment of the Constitution of the United States of America. "No person shall . . . be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation."

76. In the event the Plaintiffs' actions for inverse condemnation are not allowed to go forward, in whole or in part, based on N.C. Gen. Stat. §166A-19.60 or for any other reason, the Plaintiffs have and assert their constitutional claims for the takings noted above.

77. The Plaintiffs are entitled to just compensation under the North Carolina and United States Constitutions in the following manner: a monetary award for the property interests taken, any "cost to cure", interest as prescribed by law from the date of taking, the cost of court including a reasonable attorney fee and reimbursement for engineering, appraisal or other expert witness expenses.

### THIRD CAUSE OF ACTION
### Gross Negligence

78. This cause of action is plead in the alternative, and the allegations in paragraphs 1-77 above are realleged and incorporated herein by reference as if fully set forth therein.

79. In the event the Plaintiffs' actions for inverse condemnation or a constitutional taking are not allowed to go forward based on N.C. Gen. Stat. §166A-19.60 or for any other reason, the Plaintiffs have and assert a gross negligence claim as shown herein.

80. N.C. Gen. Stat. §166A-19.60 has an exclusion for its grant of immunity in actions involving "gross negligence."

81. Negligence and nuisance are separate torts, which sometime appear similar in effect but, in this event, on information and belief, the harm caused by the Defendants, as alleged herein, was a direct result of gross negligence.

82. Prior to damming the storm water at or near the CSX and VFW Road underpass immediately before Hurricane Matthew, the State and the City, by and through its departments, agencies, elected officials, officers, employees, or contractors knew, or should have known, the high probability of flooding that actually occurred on the Plaintiffs' property, and similarly situated properties, as a result of their placement of structures impeding and diverting storm water.

13

83. Likewise, the State and the City, by and through its departments, agencies, elected officials, officers, employees, or contractors knew, or should have known, the need for additional hydrologic and hydraulic studies prior to any structures being placed on or near the above noted underpass, based on the State's "Lumber River Basin Flood Analysis and Mitigation Strategies Study" published on May 1, 2018.

84. Even in light of professional analysis highlighting the potential for harm and actual experiences of harm during Hurricane Matthew, the City, the State or both working in collaboration, sought funding for a permanent structure to dam this natural water flow during extreme weather events; this permanent, and presumably well-built, damming structure having the potential for even greater harm to the Plaintiffs' property and those properties similarly situated.

85. Additionally, with knowledge of the previous flooding of the Plaintiffs' property and/or properties similarly situated, and with the warnings highlighted in the State's May 1, 2018 study, the City, the State or a combination of the two, by and through its officers, employees, contractors or volunteers, once again emplaced structures to impede and divert water at or near the CSX and VFW Road underpass immediately before or during Hurricane Florence.

86. Pleading in the alternative, these actions constituted gross negligence in that the above named actions of the Defendants evidenced a wanton, willful and reckless disregard for the safety of the Plaintiffs and the Subject Property, along with other individuals and properties similarly situated.

87. On information and belief, the Defendants have waived sovereign and governmental immunity or such immunity is abrogated by law in these circumstances.

88. The damages sustained by the Plaintiffs were proximately caused by the gross negligence of one or more of the Defendants.

89. Therefore, under this cause of action, which is plead in the alternative, the Plaintiffs are entitled to compensation for their losses plus pre-judgement interest, court costs, and attorney's fees as may be provided by law.

WHEREFORE, the Plaintiffs pray the Court for the following relief:

1. An award of just compensation, including costs to cure, from the Defendant State, the Defendant City or both as the facts may disclose in an amount in excess of Twenty Five Thousand Dollars ($25,000.00).

2. That the Plaintiffs have and recover their reasonable costs, disbursements and expenses, including reasonable attorneys' fees, appraisal fees and engineering fees, actually incurred because of the inverse condemnation proceedings.

3. For pre- and post-judgment interest as may be allowed by law.

4. In the alternative, an award under their constitutional taking claim from the Defendant State, the Defendant City or both as the facts may disclose in an amount in excess of Twenty Five Thousand Dollars ($25,000.00).

5. That the Plaintiffs have and recover, under their constitutional taking claim, their reasonable costs, disbursements and expenses, including reasonable attorneys' fees, appraisal fees and engineering fees, actually incurred.

6. For pre- and post-judgment interest as may be allowed by law.

7. In the alternative, an award under their gross negligence claim from the Defendant State, the Defendant City or both as the facts may disclose in an amount in excess of Twenty Five Thousand Dollars ($25,000.00).

8. The award of such court costs, including a reasonable attorney's fee, as may be allowed by law.

9. For a trial by jury.

10. For such other and further relief as the Court deems appropriate.

This the 2nd day of October, 2018.

YARBOROUGH, WINTERS & NEVILLE, P.A.

GARRIS NEIL YARBOROUGH
State Bar # 8110
H. ADDISON WINTERS
State Bar #12706
Post Office Box 705
Fayetteville, NC 28302
Telephone: 910-433-4433
E-mail: gnyesq@ywnlaw.com
         adwinters@ywnlaw.com

16





Figure 2-5: Conceptual View of VFW Road and CSX Railroad Underpass Floodgate




EXHIBIT B

Roy Cooper
Governor

**STATE OF NORTH CAROLINA**
**OFFICE OF THE GOVERNOR**

William C. McKinney
General Counsel

VIA ELECTRONIC DELIVERY & US MAIL
hmoore@ci.lumberton.nc.us

September 18, 2018

Mr. Holt Moore, Esq.
City of Lumberton
500 N. Cedar Street
Lumberton, NC 28358

Dear Mr. Moore,

The following is a recital of actions taken at the direction of the Governor, Roy Cooper, under a State of Emergency, to address critical public safety matters in response to Hurricane Florence.

Beginning on 07 September 2018, the Governor declared a State of Emergency for the State of North Carolina, Executive Order No. 51, in anticipation of Hurricane Florence's movement in the Atlantic Ocean. North Carolina vests the Governor with particular authority during a State of Emergency, including the authority to issue necessary orders in preparing for and responding to emergencies. In accordance with N.C. Gen. Stat. § 166A-19.12, the Governor may delegate powers to the Division of Emergency Management.

On Friday, 14 September 2018, in consultation with the Director of Emergency Management, Michael Sprayberry, the Governor determined that sandbags or other temporary impoundments should be installed along a tract of land owned and operated by CSX Corporation in order to protect against potential flooding of the Lumber River in the City of Lumberton. Governor Cooper verbally instructed Director Sprayberry to commence operations to put in place material necessary to elevate the levee over which the

railroad runs in order to provide protection from rising river waters in addition to other measures already undertaken to address anticipated elevated water flow. The undersigned notified Will Polk, Assistant General Counsel for the North Carolina Department of Public Safety, of this order via email on the morning of 14 September. Mr. Polk confirmed via email that the order had been commenced at the Governor's direction by and through North Carolina Division of Emergency Management.

It is my understanding that private contractors and the National Guard executed the order and installed a temporary impediment on the tract of land owned and operated by CSX Corporation in the City of Lumberton beginning on the same day. The Governor's Office notified CSX of this decision and the issuance of the order.

Should additional information be required regarding this order or other events that occurred related to the operation, please do not hesitate to contact me.

Sincerely,

William C. McKinney

WCM/swh